ATLANTIC SUGAR, LTD., AND REDPATH SUGARS, LTD., PLAINTIFFS V. UNITED STATES, DEFENDANT

AMSTAR CORPORATION, PARTY-IN-INTEREST

Court No. 80-5-00754

(Dated December 28, 1981)

*Rogers & Wells* (*Robert V. McIntyre* and *George C. Smith* on the brief) for the plaintiffs.
*J. Paul McGrath*, Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch (*Francis J. Sailer* on the brief), for the defendant.
*Sullivan & Cromwell* and *Baker & McKenzie* for the party-in-interest.

WATSON, *Judge:* Plaintiffs, Atlantic Sugar, Ltd. and Redpath Sugars, Ltd., brought this action under section 516A(a)(2) of the Tariff Act of 1930 (19 U.S.C. 1516a(a)(2)) to challenge a final determination made by the International Trade Commission (ITC) in an antidumping investigation. The International Trade Commission found that importations of refined sugar from Canada, which were being sold at less than their fair value at the end of 1978 and the beginning of 1979, were causing material injury to an industry in the United States. [1]

The parties cross-moved for judgment on the administrative record under Rule 56.1 of the rules of this Court. Following the discovery of miscalculations in the data underlying some of the ITC findings this Court remanded the matter to the ITC for reconsideration. [2] This

---

[1] *Sugars and Sirups From Canada*, Inv. No. 731-TA-3, USITC Pub. No. 1047 (March, 1980).
[2] *Atlantic Sugar, Ltd. et al.*, v. *United States*, Court No. 80-5-00754, CIT 2, 18 Slip Op. 81-62 (July 8, 1981).

resulted again in a determination of injury [3] which is now before the Court for review.

The review centers on two issues, whether the ITC was correct in finding that a regional sugar industry existed and whether it was correct in finding material injury within the meaning of the law. This decision may therefore be divided into two distinct sections.

# I

For the purposes of the determination, the ITC utilized the definition of industry set out in section 771(4)(C) of the Tariff Act of 1930, (19 U.S.C. 1677(4)(C)). That definition allows the injury finding to be made with respect to less than all the domestic producers and less than the producers of the major proportion of domestic production. In this case, the ITC made its injury finding with respect to an eleven-state Northeastern region [4] and seven producers located therein.

The statutory provision which controls this determination reads as follows:

> (C) REGIONAL INDUSTRIES.—In appropriate circumstances, the United States for a particular product market, may be divided into 2 or more markets and the producers within each market may be treated as if they were a separate industry if—
>> (i) the producers within such market sell all or almost all of their production of the like product in question in that market, and
>> (ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.
> In such appropriate circumstances, material injury, the threat of material injury, or material retardation of the establishment of an industry may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a like product constitutes a major proportion of the total domestic production of that product, is not injured, if there is a concentration of subsidized or dumped imports into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured or threatened by material injury, or if the establishment of an industry is being materially retarded, by reason of the subsidized or dumped imports.

The dispute regarding the correctness of limiting this determination to a region centers on the provision that "demand in that market is not supplied, to any substantial degree" by producers elsewhere in the United States. In its first determination the ITC found that this

---

[3] *Sugars and Sirups From Canada*, Inv. No. 731-TA-3 (October 5, 1981).

[4] The region consisted of the states of Connecticut, Maine, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island and Vermont.

condition was satisfied by the fact that only 5.5 percent of the sales of producers outside the region were made to customs within the region. During the pendency of this judicial review, it acknowledged the error of making the calculation as a percentage of the total sales of those producers located outside the region and recognized the necessity of making its calculation as a percentage of all sales made within the region. When this was done, the percentage was approximately 12 percent for the period in question; that is to say, during the 1975–1979 period approximately 12 percent of the demand in this region was satisfied by domestic producers located outside the region. The Court remanded this matter for consideration of the new figure in relation to the statutory condition.

The ITC has now repeated its determination that this region satisfies the conditions of the statute.[5] It has explained its determination in the following manner. It viewed subsection (4)(C)(ii) as requiring that the demand in the region not be satisfied "substantially" by domestic goods produced outside the region. It then proceeded to define the word "substantial" in the sense of what would represent a "substantial" degree of outside supply. Essentially it divided the matter into two calculations. It first determined whether the percentage was "substantial" in an empirical sense, and utilized a dictionary definition of "substantial" as "considerable in amount" to conclude that, on its face, 12 percent does not raise a question as to whether there is a "considerable" quantity or amount of nonregionally produced products being consumed in the region. It then found support for this conclusion in the particular character of the region and the supply.

The Court detects in this explanation an alteration of the statutory standard. The word "considerable" has the meaning in a colloquial sense of "a good deal of" or a "large quantity."[6] If this is the implication of the ITC's explanation, then it is developing a standard under which a market can be considered isolated and separate for injury determinations even though its demand is satisfied to a meaningful extent from elsewhere in the United States. This would be at variance with the statute. The statute has a plain meaning and admonitory tone which clearly rules out anything except insubstantial supply from elsewhere. The Court understands the provision to forbid *any degree* of supply which could be characterized as substantial. This is the direct result of the use of the word "any" rather than the word "a." The statute therefore forbids any degree of supply from elsewhere beyond that which can be termed insubstantial under the circumstances.

---

[5] See note 3, *supra*. The ensuing quoted excerpts are from pages 6, 7 and 8 of the ITC determination.

[6] M. Nicholson, A. Dictionary of American-English Usage (Oxford University Press, 1957).

This prohibition is consistent with the objective of finding a separate industry in an isolated market and insures that the basic justification exists for ignoring the remainder of the domestic industry. As a consequence, the Court does not approve the reasoning in the ITC determination which suggests that this percentage does not even present a difficulty.

In the abstract, this degree of penetration of the market is inconsistent with the statutory condition that the isolated market not be supplied from elsewhere to "any substantial degree." If this degree of supply from elsewhere was more evenly dispersed in the region, the Court would be inclined to find that the market was not sufficiently isolated in the statutory sense to be a proper microcosm for the application of the antidumping law. However, there were other factors considered by the ITC which dissuaded the Court from following this line of reasoning to a conclusion that the ITC had not acted in accordance with the law. These were factors showing inherent limitations in the sales data used by the ITC and also showing the concentration of outside supply in the periphery of the region. These factors led the Court to conclude that, even under its stricter view of the limitation on outside supply, the statutory conditions have not been violated in this case.

The significance of the 12 percent is reduced by the fact that a portion of the supply from elsewhere is generally confined to a part of Southern Ohio and to parts of Michigan. The inclusion of these areas in the region is explained by the practical difficulty of obtaining statistics on sales information other than for complete states. To the extent that the quantum of supply from elsewhere results from an imprecision inherent in the form of the available statistical data it does not discredit the ITC's finding.

Beyond this, when it is considered that much of the remaining outside supply is limited to the perimeter of the region the significance of the degree of supply from elsewhere is further diminished. It would be unreasonable to expect any market to be hermetically sealed off from the rest of the country. It follows that the existence of a modicum of supply from elsewhere on the perimeter of a region is consistent with the existence of a separate market in that region.

Due to these two modifying factors the Court does not consider that demand in this region was satisfied from elsewhere to any substantial degree.

Finally, on the subject of the existence of a regional industry, the Court turns to a few related points argued by the parties. The Court sees no defect in the ITC's delineation of the market in a manner which varies from the boundaries discerned by other government

agencies [7] or which excludes a nearby production facility such as Amstar's Baltimore plant. The record supports the view that this production facility has a marketing orientation away from the Northeast. There is no indication in the statute that the isolation of a market must only be the result of immutable commercial impediments such as transportation costs or geographical conditions beyond the control of the producers. It would appear that the deliberate marketing practices of producers can serve to justify the drawing of market boundaries between them even though they may have the physical capability of crossing those boundaries. Consequently, the decision not to include Maryland in the separate market is viewed as a permissible recognition of a market boundary and is not "arbitrary or freehanded sculpting," the possibility of which concerned the Court in its first opinion.

For the reasons expressed above, the ITC's treatment of an eleven-state region of the Northeastern United States as a separate market for the determination of injury is found to be in accordance with the law. This conclusion is reached despite the Court's disagreement with the ITC's expressed standard for determining whether demand in the market is being satisfied from elsewhere to any substantial degree. The ITC's findings with respect to other factors involved in the degree of supply from elsewhere justify the determination even under the Court's stricter view of the statutory standard.

## II

The remaining issue in this action involves the actual determination of material injury, specifically, whether the injury was experienced by "the producers of all, or almost all of the production within that market." In its original determination the ITC based its decision in significant part on the effect of the imports on the profits of the seven producers in the region, including a net loss for the Revere Sugar Corporation (Revere), the second largest producer, with approximately 24 percent of sales in the region. Corrected data revealed that Revere actually had a net profit for the period in question and the Court remanded the matter for a reconsideration of the question of injury. The ITC again concluded that the industry in the region had suffered material injury.[8] It averaged the data for Revere with that for the other producers and found that in the aggregate "all seven

[7] For example, a map evidently prepared by the U.S. Department of Agriculture to show its Wholesale Sugar Price Quotation Regions includes Maryland, Delaware, Virginia and West Virginia in its Northeast Region. (Brief of Amstar Corporation Regarding Corrected Data before the ITC).

[8] See note 3, *supra*. The ensuing quoted excerpts are from page 14 of the ITC determination.

firms in the Northeastern states region have declining profits." The ITC concluded that "even with the corrected data, overall profits have declined but the decline was simply not as steep" and further that "the corrected data still support our finding that producers of all or almost all the production are materially injured."

' The ITC rejected an argument by plaintiffs that it was incorrect to aggregate data for the purpose of determining whether the "producers of all or almost all of the production" are materially injured. The ITC justified its technique by stating that "the statute is concerned with determining whether a regional industry is being materially injured, not whether particular producers are injured." [9] It followed with an analysis of the law and legislative history purporting to justify a focus on the industry in the aggregate rather than on individual firms.

The law and its legislative history show only that the ultimate object of these investigations is to determine whether there is injury to an industry.[10] There is no justification for general or "aggregate" determinations which do not reflect the specific condition of individual producers included in the "aggregate." The Court therefore finds the method used by the ITC to evaluate the profitable operation of the second largest producer in the region to be at variance with the law.

Injury to an *industry* cannot be determined without first finding injury to individual producers. That is the unalterable and logical progression of the statutory determination. The Court is in complete disagreement with the statement in defendant's brief that "individual firm data are inherently unreliable in the context of a determination aimed at establishing whether an entire region consisting of several firms is being materially injured or not." [11] It seems to the Court that individual firm data are the foundation of this determination and it is only when the facts show injury to individual producers that they may be utilized for broader conclusions about the industry. Furthermore, a conclusion about injury to the *industry* cannot be made until it is determined that those who are injured individually are, *in the aggregate*, the producers of "all or almost all" of the region's production. Thus, the only aggregation permitted by the law is that of the production of those who have been injured individually. If their production represents all or almost all of the region's production then the *industry* has been injured within the meaning of the law.

---

[9] See note 3. The quote is from page 15 of the ITC determination.

[10] S. Rep. No. 96-249, 96th Cong., 1st Sess. 82, 83 (1979).

[11] Defendant's Supplemental Memorandum In Support of The International Trade Commission's New Determination at 14.

If there are producers who are not injured that fact must be confronted directly. It is incorrect to nullify the profitable operation of one producer by blending it with the loss of another and presenting the result as an "aggregate" indication of injury to both. A distinction must be maintained between those producers who are injured and those who are not. Once that distinction is made the question becomes whether those who are injured produce all or almost all of the region's production.

It must be recognized that, within a region, this law does not reach the injurious effect of importations sold at less than fair value unless the injurious effect extends to those within the region who produce *all or almost all* of the regional production. If anything, it can be said that injury in a regional industry must extend more completely to the production of the region than would injury in the national context. In the latter case industry is defined *inter alia* as "those producers whose collective output of the like product constitutes a *major proportion* of the total domestic production of that product." [emphasis supplied] (19 U.S.C. 1677(4)(A)) Thus, in the nation as a whole, injury can be found with respect to those who produce a "major proportion" of domestic production. In a region, injury can be found only if those who produce "all or almost all" of the production are injured. It would have been a simple matter to extend the first standard to a regional industry and require injury to those who produce a "major proportion" of the production in the region. In fact, however, the regional industry provision, in its inception, speaks only of the producers in the market and, when it comes to injury, to the producers of "all or almost all" of the production. In plain terms it would seem that "a major proportion" is not as much as "almost all" of something. This strongly suggests that the smaller the locale within which injury is sought, the more pervasive it must be.

In light of the above, the ITC must first determine whether Revere was injured within the meaning of the statute. If it was injured, then it may be linked with those other producers who were injured. If the entire injured group produces all or almost all of the production, then a finding of injury to the industry is proper.

It bears repetition that this provision does not reach the injurious effect of importations sold at less than fair value unless the injurious effect extends to those within the region who produce *all or almost all* of the production. The number of those producers who are injured relative to the number who are not injured is immaterial.

If Revere did not suffer injury, the remaining question is only whether those who *were* injured produce all or almost all of the production. If this point is reached in the administrative determinations the Court does not presently see how the remaining 76 percent of pro-

duction can be considered to be "all or almost all." It would seem that the plain meaning of this statutory requirement could only be satisfied by a percentage which came much closer to being all the production. Nevertheless, in these formative stages of the administration of this law and out of a scrupulous desire to extend to the administrative agency the fullest opportunity to consider any facts which justify a contrary result, the Court will not foreclose the possibility of such a conclusion at this time.

In light of the above, this matter is remanded to the ITC to determine whether the Revere Sugar Corporation suffered injury within the meaning of this statue and if not, whether there is any reason to conclude that those who *were* injured are the producers of all or almost all the production in the region. The ITC shall report its determination to the Court within 120 days of the date of entry of this order.